PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JONATHAN F. BOOTH,
         *Plaintiff-Appellant,*

v.

STATE OF MARYLAND, DEPARTMENT OF
PUBLIC SAFETY AND CORRECTIONAL
SERVICES; LAMONT W. FLANAGAN,
Commissioner; WILLIAM JEDNORSKI,
Warden; GEORGE CHILDS, Chief of
Security; HERBERT H. AIKEN;
MICHAEL A. JOINER,
         *Defendants-Appellees.*

No. 02-1657

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, District Judge.
(CA-02-160-JFM)

Argued: February 25, 2003

Decided: April 30, 2003

Before LUTTIG, TRAXLER, and KING, Circuit Judges.

---

Affirmed in part, reversed in part, and remanded by published opinion. Judge Traxler wrote the opinion, in which Judge Luttig and Judge King joined.

---

## COUNSEL

**ARGUED:** John B. Stolarz, STOLARZ & BRICKER, Baltimore, Maryland, for Appellant. Glenn Todd Marrow, Assistant Attorney

General, DEPARTMENT OF PUBLIC SAFETY AND CORREC-
TIONAL SERVICES, Baltimore, Maryland, for Appellees. **ON
BRIEF:** J. Joseph Curran, Jr., Attorney General of Maryland,
DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL
SERVICES, Baltimore, Maryland, for Appellees.

---

**OPINION**

TRAXLER, Circuit Judge:

Jonathan F. Booth, a uniformed correctional officer employed by
the State of Maryland, filed this action against the State and five of
its employees after he was subjected to disciplinary action for wearing
his hair in dreadlocks in violation of his employer's dress code and
grooming policy. Booth alleged religious and racial discrimination, in
violation of 42 U.S.C.A. § 1981 (West 1994) and 42 U.S.C.A. § 1983
(West Supp. 2002), and Articles 24 and 36 of the Maryland Declara-
tion of Rights, as well as a state law claim for defamation. The district
court granted the defendants' motion for summary judgment and
denied the plaintiff's motion for summary judgment. *See Booth v.
Maryland*, 207 F. Supp. 2d 394 (D. Md. 2002). We affirm in part,
reverse in part, and remand.

I.

Booth is an African-American male employed as a uniformed cor-
rectional officer with Maryland's Department of Public Safety and
Correctional Services, Division of Pretrial Detention and Services
(the "Division"). He is assigned to work at the Baltimore Central
Booking and Intake Center in Baltimore, Maryland.

The Division has in place a dress code and grooming policy,
referred to as DCD 50-43, which sets forth permissible hairstyles for
male and female uniformed personnel. Relevant to this litigation, the
policy provides as follows:

    a.  Hair shall be neatly groomed. Hair in front shall be
        groomed so that it does not fall below the band of the

properly worn uniform headgear. Hair on the back of the head may not extend further than one quarter inch onto the collar. Hair on the side of the head may touch but shall not extend onto the collar. In no case shall the bulk, length, or height of the [hair], interfere with proper wearing of authorized uniform headgear, emergency equipment, or styled to impair the employee's vision. The length[,] bulk, or appearance of hair shall not be excessive, ragged, or unkept.

b.  (Females) Buns, braids and ponytails shall be permitted on top of the head or back of the head, in a neat manner, provided they do not interfere with the proper wearing of authorized uniform headgear or emergency equipment and do not extend below the collar. Braids and ponytails not secured to the top of the head shall meet length standards outlined in [a].

c.  Only traditional (i.e., historically acceptable for military/law enforcement uniformed personnel), haircuts shall be permitted.

J.A. 93-94. Booth's hairstyle does not comport with DCD 50-43 because he wears dreadlocks. He alleges that he is "a practicing member of the Rastafarian religion, a bona fide religious organization," of which "[t]he growing and wearing of dreadlocks is a tenet." J.A. 16. According to Booth, dreadlocks are regarded by Rastafari as "a sign of their African identity," as well as "a religious vow of their separation from the wider society." J.A. 16. Thus, Booth has chosen to wear his hair in dreadlocks, which he characterizes as "short, braided, and worn close to the scalp." J.A. 16.

In November 2001, following a number of requests by his employer that he cut his hair to comply with DCD 50-43, Booth advised his superiors that his Rastafarian religion required him to wear his hair in dreadlocks and requested a reasonable accommodation to wear his hair in accordance with his religious beliefs. However, Booth was denied his request for a religious exemption to the policy and was informed that progressive discipline would be imposed if he did not comply with the policy. Booth refused to do so

and, over the next month, was subjected to progressive disciplinary measures for his continuous violation of the policy. In addition to DCD 50-43, Booth alleges that he was cited for the violation of two sections of the Division's Standards of Conduct and Internal Disciplinary Process, which require an employee to "set a positive example in his/her overall appearance and grooming" and to "maintain a proper appearance." J.A. 17.

Faced with the choice of complying with DCD 50-43 or incurring escalated disciplinary measures, Booth filed suit in Maryland state court against the State of Maryland, the Commissioner of the Department of Public Safety and Correctional Services, and four of his superiors assigned to the Baltimore Central Booking and Intake Center. Booth asserted a claim under 42 U.S.C.A. § 1983 that the defendants' application of the grooming policy to him violated his constitutional right to practice his religion under the First and Fourteenth Amendments, a claim under 42 U.S.C.A. § 1981 that the defendants enforced the grooming policy against him in a discriminatory fashion because he is an African-American, concomitant discrimination claims under Articles 24 and 36 of the Maryland Declaration of Rights, and a state law claim for defamation. The case was removed to district court and the parties filed cross-motions for summary judgment. Booth appeals the district court's decision denying his motion for summary judgment and granting the defendants' motion for summary judgment.

## II.

The Free Exercise Clause of the First Amendment, applicable to the states through the Fourteenth Amendment, forbids the adoption of laws designed to suppress religious beliefs or practices unless justified by a compelling governmental interest and narrowly tailored to meet that interest. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993); *Hines v. S.C. Dep't of Corrections*, 148 F.3d 353, 357 (4th Cir. 1998) (noting that the Free Exercise Clause "forbids state governments from adopting laws designed to suppress religious beliefs or practices"). The Free Exercise Clause, however, "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Employment Div., Dep't of Human Res. v.*

*Smith*, 494 U.S. 872, 879 (1990) (internal quotation marks omitted). "[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of Lukumi*, 508 U.S. at 531; *see American Life League, Inc. v. Reno*, 47 F.3d 642, 654 (4th Cir. 1995) (noting that such a law "does not offend the Free Exercise Clause, even if the law has an incidental effect on religious practice"). The inquiry into a Free Exercise challenge, however, does not "end with the text of the laws at issue." *Church of Lukumi*, 508 U.S. at 534.

> The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination. The Clause forbids subtle departures from neutrality and covert suppression of particular religious beliefs. Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility which is masked as well as overt. The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders.

*Id.* at 534 (internal citations and quotation marks omitted).

Booth asserts that DCD 50-43, as applied to him, violates his freedom to exercise his religion guaranteed by the First Amendment. More particularly, Booth alleges that the defendants violated his First Amendment rights by refusing his request for an accommodation to wear his hair in modified dreadlocks, that the request was not unreasonable because similarly situated females are allowed to wear their hair braided and substantially longer than the dreadlocks he wears, and that the defendants have not enforced the policy against approximately thirteen similarly-situated employees who have violated the policy but who have not been disciplined. Additionally, Booth points to evidence which demonstrates that the defendants have granted religious exemptions from DCD 50-43 to one Jewish employee, allowing him to wear a long beard and peyos (long sideburns), and one Sikh employee, allowing him to wear a turban and long beard. *See Booth*, 207 F. Supp. 2d at 397 n.5 (noting that "[a]lthough the rules do not provide explicitly for religious exemptions, the defendants have

granted them in the past because they believed they were required to do so pursuant to Title VII").

In their motion for summary judgment, the defendants asserted that the grooming policy passed constitutional scrutiny because the policy is facially neutral and rationally related to the Division's goals of promoting safety, uniformity, discipline, and *esprit de corps* among the correctional staff at the facility. The district court agreed, noting that there was "no indication, either from their language or effect, that the rules that Booth challenge[d] as violative of his rights were targeted at Rastafarians or members of other religious groups," *id.* at 397, and that they were "rationally related to the division's legitimate interests in public safety, discipline and esprit de corps," *id.* at 398.

We agree, insofar as this holding goes. Indeed, Booth readily acknowledges to us that the policy does not discriminate on its face. DCD 50-43 is applicable to all uniformed correctional staff of the Division, regardless of race or religious affiliation. There is no evidence that the Division developed the policy to regulate or prohibit religious activities, including Booth's practice of Rastafarianism, and the defendants presented persuasive evidence that DCD 50-43 was likely adopted for the neutral secular purposes of promoting public safety, discipline, and *esprit de corps*.

The district court erred, however, in ending the inquiry here. Booth's claim is that the facially neutral policy is being applied in a discriminatory manner because the Division has granted religious exemptions to others who were similarly situated to him. At a minimum, Booth presented at least some evidence that the legitimate secular purposes underlying the policy have been abandoned in a manner that favors other religions over his religion and, therefore, that the policy has been applied to him in an unconstitutional manner.

The district court, however, appears to have been under the belief that Booth's § 1983 claim, to the extent it alleged disparate application of the policy to him based upon his religious beliefs, was preempted by Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000e to 2000e-17 (West 1994 & Supp. 2002). The district court noted Booth's argument that "the defendants' failure to consistently enforce its policy demonstrates that the defendants' stated legitimate

reasons are not their real reasons for the policy, but are only pretext for their discrimination against him." *Id.* at 398 n.7. However, the district court summarily ruled that "[t]his argument might be persuasive if Booth was pursuing a Title VII discrimination claim, but he is not." *Id.* At another point, the district court noted that any targeting of Booth based on his religious beliefs would be based on the "defendants' allegedly discriminatory *enforcement* of the [policy] against him," but stated that "[s]uch a claim of discriminatory enforcement [must] be based on Title VII, not the First Amendment." *Id.* at 397 n.4 (internal citation omitted); *see also id.* at 397-98 n.5 (noting that "Booth has not brought a failure to accommodate claim pursuant to Title VII so I will not consider whether it would be an undue hardship for the defendants to grant him an accommodation. For the purpose of this motion, I will assume that there are no religious exemptions to the hairstyle policy."); *id.* at 398 n.6 (stating that the defendants' "alleged failure to consistently enforce the rule against other employees does not qualify as a secular exemption. These employees enjoy no greater protection under the terms of the rule than does Booth. All of them are still subject to discipline for its violation. This allegedly inconsistent enforcement of the rule might form part of the basis of a prima facie case of religious discrimination pursuant to Title VII, but Booth has not made such a claim."). In sum, it appears that the district court implicitly ruled that Booth had not made an "as applied" challenge to the defendants' application of the policy to him because such a challenge can only be brought under Title VII. This was error.

In *Keller v. Prince George's County*, 827 F.2d 952, 957 (4th Cir. 1987), a panel of this circuit first considered the question of "whether Congress intended in adopting § 2 of the Equal Employment Opportunity Act of 1972 to make Title VII the exclusive remedy for public sector employment discrimination in violation of constitutional safeguards." After observing that Title VII was silent on the question and that the legislative history indicated that it was not so intended, the panel held that Title VII does not preclude a public sector employee from bringing a § 1983 action based on alleged violations of the Equal Protection Clause. *See id.* at 963; *cf. Zombro v. Baltimore City Police Dep't*, 868 F.2d 1364, 1370 (4th Cir. 1989) (noting our circuit's previous recognition of "the validity of § 1983 actions [brought by public sector employees] predicated on race, sex, or religious discrimination or an infringement of specific First Amendment rights").

Several years later, in *Beardsley v. Webb*, 30 F.3d 524, 526-27 (4th Cir. 1994), a separate panel reaffirmed *Keller*'s holding, rejecting a claim that the Civil Rights Act of 1991, which allowed the recovery of damages and provided for trial by jury, impliedly intended to make Title VII the exclusive remedy for a public employee's claim of employment discrimination. Nor have we been alone in this view of the interplay between § 1983 and Title VII in public sector employee cases. *See*, *e.g.*, *Thigpen v. Bibb County, Ga., Sheriff's Dep't*, 223 F.3d 1231, 1239 (11th Cir. 2000) (A "section 1983 claim predicated on the violation of a right guaranteed by the Constitution — here, the right to equal protection of the laws — can be pleaded exclusive of a Title VII claim."); *Annis v. County of Westchester*, 36 F.3d 251, 254-55 (2d Cir. 1994) (same).

Shortly after our decision in *Beardsley* was issued, however, a separate panel of our court, in a footnote, declined to consider a public sector employee's sex discrimination claim under § 1983. *See Hughes v. Bedsole*, 48 F.3d 1376, 1383 n.6 (4th Cir. 1995). Without citation to either *Keller* or *Beardsley*, the panel stated that the plaintiff could not "bring an action under § 1983 for violation of her Fourteenth Amendment rights because [she] originally could have instituted a Title VII cause of action." *Id.* This footnote, in turn, has led several district courts to erroneously conclude that it must follow *Hughes*, instead of *Keller*, either because *Hughes* is a more recent decision by this court or because the plaintiff in *Hughes*, unlike the plaintiff in *Keller*, did not bring a Title VII claim along with a Section 1983 claim. *See*, *e.g.*, *Shelton v. Richmond Public Schools*, 186 F. Supp. 2d 646, 650-51 (E.D. Va. 2002); *Brown v. Housing Auth. of Calvert County*, 150 F. Supp. 2d 856, 862 (D. Md. 2001);* *Burtnick v. McLean*, 953 F. Supp. 121, 123 (D. Md. 1997).

It is quite settled that a panel of this circuit cannot overrule a prior panel. Only the *en banc* court can do that. *See Bell v. Jarvis*, 236 F.3d 149, 159 (4th Cir. 2000) (en banc) (citing *Jones v. Angelone*, 94 F.3d 900, 905 (4th Cir. 1996)). And, we are unpersuaded that the viability

---

*On appeal, the plaintiff in *Brown* did not challenge the district court's dismissal of his claims brought under § 1983. *See Brown v. Housing Auth. of Calvert County*, 26 Fed. Appx. 339, 2002 WL 191577 at **1 (4th Cir. 2002) (unpublished).

of a § 1983 claim hinges upon whether a plaintiff pleads a Title VII claim alongside it. *See Thigpen*, 223 F.3d at 1239 (holding that "[a]lthough discrimination claims against municipal employers are often brought under both Title VII and the equal protection clause (via section 1983), the two causes of action nonetheless remain distinct. Plaintiffs' section 1983 equal protections claims, therefore, are not barred by Plaintiffs' failure to plead Title VII claims."); *Annis*, 36 F.3d at 255 (holding "that an employment discrimination plaintiff alleging the violation of a constitutional right may bring suit under § 1983 alone, and is not required to plead concurrently a violation of Title VII"). Because this panel is bound to follow the decisions in *Keller* and *Beardsley*, we reverse and remand Booth's § 1983 claim to the district court for further proceedings. Our resolution of the First Amendment claim necessarily requires us also to reverse the district court's grant of summary judgment as to Counts I and IV, which request declaratory and injunctive relief, and Counts V and VI, which allege concomitant state constitutional claims of religious discrimination under Articles 24 and 36 of the Maryland Declaration of Rights.

## III.

The district court also granted summary judgment to the defendants on Booth's claim of intentional racial discrimination in violation of 42 U.S.C.A. § 1981. In this claim, Booth alleges that he was discriminated against as an African-American because, while his superiors have applied DCD 50-43 in an attempt to prohibit him from wearing the hairstyle called for by the tenets of his Rastafarian religion, his superiors have allowed white employees to wear their hair in lengths which are violative of the same policy. The district court ruled that it was "not possible to infer that any disparate discipline against Booth was motivated by racial discrimination" because Booth's evidence demonstrated that "both white and African-American employees were treated differently than Booth" in this regard. *Booth*, 207 F. Supp. 2d at 399 (citing *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 512 (4th Cir. 1993) ("The question confronting a judge . . . is whether the record as a whole gives rise to a reasonable inference of racially discriminatory conduct by the employer.")). We agree.

In support of his motion for summary judgment, Booth identified thirteen employees who allegedly violated the grooming policy, but

who were not disciplined. Booth does not identify the particular employee's race in each instance, but it is clear that at least four of the seven male employees and three of the nine female employees were African-Americans. Furthermore, Booth's claim of *racial* discrimination in reality rests upon his claim that the followers of the Rastafarian religion are predominately African-Americans. Thus, the factual basis behind Booth's claim of racial discrimination is not in any material respect different from that offered in support of his claim of religious discrimination. Because Booth failed to demonstrate that the defendants enforced DCD 50-43 against him in a discriminatory fashion because he is African-American, we affirm the district court's grant of summary judgment to the defendants on Booth's claim of racial discrimination under § 1981.

IV.

We also affirm the district court's grant of summary judgment to the defendants on Booth's defamation claim. Booth alleges that the defendants defamed him by disseminating information that he had violated DCD 50-43. However, in order to establish a prima facie case of common law defamation under Maryland law, Booth was required to "'establish that the defendant[s] made a defamatory statement to a third person; that the statement was false; that the defendant[s] [were] legally at fault in making the statement; and that the plaintiff thereby suffered harm.'" *See Gohari v. Darvish*, 767 A.2d 321, 327 (Md. 2001) (quoting *Rosenberg v. Helinski*, 616 A.2d 866, 871 (1992)). Summary judgment was appropriate, the district court ruled, because "[r]egardless of the merits of the challenged rules, it is true that Booth violated them." *Booth*, 207 F. Supp. 2d at 400. Because Booth failed to present evidence that the defendants disseminated a false statement about him, he failed to establish a prima facie case of defamation under Maryland law.

V.

For the foregoing reasons, the decision of the district court is affirmed in part, reversed in part, and remanded.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*