# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 6, 2025

Lyle W. Cayce
Clerk

No. 24-50394

_____

Jane Justice Doe,

*Plaintiff—Appellant*,

*versus*

Kerrville Independent School District,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:21-CV-369

_____

Before Stewart, Clement, and Wilson, *Circuit Judges*.

Per Curiam:[*]

A former student sued Kerrville Independent School District (KISD) under Title IX and 42 U.S.C. § 1983 in connection with alleged sexual harassment and abuse by two KISD teachers. After she presented her case-in-chief at trial, the district court entered judgment as a matter of law in favor of KISD. Because the plaintiff failed to offer legally sufficient evidence to support her claims, we affirm.

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-50394

## I.

During 2017 and 2018, Jane Doe was a student at KISD's Tivy High School. Jane contends that she was sexually abused by two teachers there.

The first was JROTC Instructor Lieutenant Colonel (Ret.) Christopher Edwards. Edwards allegedly sexually harassed Jane from January to September 2017. When Jane reported the abuse to another JROTC instructor that September, school administrators began an investigation and notified the Kerrville Police Department. A few days later, Edwards resigned from his position.

Around the same time, there was allegedly another inappropriate staff-student relationship at Tivy High—involving different individuals—that led to another staff resignation. In response, the Superintendent of KISD, Mark Foust, sent two letters to KISD parents. The first letter notified parents of the two alleged inappropriate relationships at Tivy, without identifying the individuals involved. The second letter promised that Tivy's principal, Shelby Balser, would meet with students and staff about maintaining appropriate teacher-student relationships. Foust testified at trial that KISD also took additional steps to re-train employees on sexual misconduct.

Jane asserts that the second individual to abuse her was her math teacher, Aaron Chatagnier, who developed a close relationship with Jane after Edwards's resignation. In December 2017, Chatagnier exchanged heated emails with Jane's second-period teacher over Jane's repeated tardiness coming from Chatagnier's first-period class. As a result, Balser reprimanded Chatagnier for his brusque tone towards the other teacher and directed him to release Jane timely from his class.

In February 2018, Balser learned that Jane had been skipping her off-campus career program and staying in Chatagnier's class during sixth and

seventh periods while he was teaching other students. Balser and the assistant school principal met with Chatagnier and told him that Jane could not be in his classroom during unscheduled times. The same day as that meeting, Jane's mother emailed KISD's assistant superintendent, Wade Ivy, to complain about Tivy's staff "checking up on [Jane] and questioning [her whereabouts]." Jane's mother explained that Jane "get[s] counsel from Mr. Chatagnier," that Chatagnier was a long-time "friend of [her] husband," that "[Chatagnier] communicate[d] with [her]," and that Chatagnier "ha[d] been vital in [Jane] not falling apart" and "in [Jane's] recovery." She expressed deep frustration at the notion that her daughter was being singled out for scrutiny because of what Edwards did.

Still, school administrators scheduled a meeting a few days later with Jane's family and informed them that Jane could not be in Chatagnier's class outside of scheduled time. Ivy also stated that Chatagnier would not be allowed to tutor Jane at school, as he had been doing since Edwards resigned. Jane's parents nonetheless expressed their desire for Chatagnier to continue to tutor Jane, and Ivy conceded to them that the school could not stop Chatagnier from tutoring Jane outside of school.

So with full knowledge of Jane's parents, Jane and Chatagnier began meeting off campus at a nearby university for the ostensible purpose of tutoring. There is no evidence that the school knew of this arrangement. It was during these meetings that Chatagnier's behavior towards Jane allegedly turned sexual. At the time, Jane did not tell her parents of the abuse, and she did not report it to school administrators.

On February 20, 2018, Tivy High administrators again met with Chatagnier to stress their expectation that he maintain professional boundaries with Jane. Chatagnier purportedly thanked them for putting parameters in place and stated his wish to distance himself from Jane. But on

March 1, a school counselor walked into Chatagnier's class during sixth period and noticed Jane "kneeling on the ground" and talking to Chatagnier while he sat his chair, and while other students were in the classroom taking an exam. The next day, the counselor emailed Balser to share her observation and to note that, despite having spoken to Jane about "appropriate relationships with adults," Jane was "forming an unhealthy dependence on a staff member who is unable to set appropriate boundaries with her."

In response, Balser sent Chatagnier a written directive instructing him that students could only be in his classroom during scheduled times and that he needed to set appropriate boundaries. Attached to the written directive was a professional boundaries self-assessment. Chatagnier signed and dated the directive on March 5. Chatagnier also attended additional ethics training.

There seem to have been no further indications of impropriety until Balser received a report that Jane had left her second-period class on April 13 with an apparent illness and gone to Chatagnier's classroom. A review of the security video footage confirmed that Jane was in Chatagnier's classroom for the entire second period, in violation of Balser's written directive from March.

On April 27, Chatagnier and Jane showed up to school wearing matching car-show t-shirts. Jane also told another student that she and Chatagnier had "hooked up" over the preceding weekend. When Balser called Jane's parents to investigate, Jane's mother replied that Jane's father had accompanied them to the car show. And regarding the "hooked up" comment, Jane's father reportedly explained that Jane "says inappropriate

things and he [was] working on that with her." As a result, Balser could not substantiate anything untoward from that weekend.[1]

On April 30, 2018, school administrators confronted Chatagnier. Chatagnier maintained that Jane's father had been present at the car show. Chatagnier then lied about Jane's location during second period on April 13, at least until he was presented with video evidence. After Ivy told Chatagnier that he would be terminated, Chatagnier resigned. However, as they had done before, Jane's parents sided with Chatagnier. That same day, Jane's upset mother called Balser to express frustration about Chatagnier's resignation.[2] A few days later, Jane's mother notified the school that Jane would be transferring to another KISD high school.

On May 1, Balser sent a letter to Tivy High parents to inform them that Chatagnier had "resigned his position for personal reasons," without any further detail. A week later, Foust filed a report with the Texas Education Agency (TEA) regarding Chatagnier's inability to maintain professional boundaries with Jane. Foust's report detailed much of the above history but stated that there was no "evidence that a sexual or romantic relationship exist[ed]." Chatagnier eventually received a reprimand from TEA.

Jane went on to graduate from high school in May 2019. She did not tell any KISD staff about Chatagnier's sexual abuse. KISD learned of it

_____

[1] It was later revealed that Jane had attended the car show with only Chatagnier, with her parents' full knowledge and permission. At trial, Jane testified that she and Chatagnier engaged in sexual intercourse on the trip.

Jane's mother admitted she had been "dishonest with [the school] because [she] didn't trust them." She also testified that Jane did not tell her about the sexual relationship until a year later.

[2] Jane's family also met Chatagnier at a restaurant later that day.

only in June 2020, when the Kerrville Police Department notified KISD that Jane had filed a report against Chatagnier for sexual assault that she alleged happened in March 2018. In March 2021, Jane sued KISD, asserting Title IX claims for hostile environment and retaliation and a § 1983 claim for failure to supervise. Jane alleged, *inter alia*, that KISD and its employees did not take adequate steps to prevent Edwards's and Chatagnier's abuses despite multiple warning signs.

The district court presided over a four-day jury trial. Following Jane's case-in-chief, KISD moved for judgment as a matter of law (JMOL) under Federal Rule of Civil Procedure 50. The district court granted the motion as to Jane's remaining claims, which were solely related to Chatagnier.[3]

Jane now appeals that ruling, arguing that (1) the district court abused its discretion and violated her right to due process by giving Jane's attorneys only fifteen minutes to review KISD's JMOL motion and (2) the district court erred in entering JMOL because Jane produced legally sufficient evidence to support her Title IX and § 1983 claims premised on KISD's response to Chatagnier's conduct.

## II.

This court reviews constitutional questions *de novo*. *United States v. Perez-Macias*, 335 F.3d 421, 425 (5th Cir. 2003). "Discretionary matters, including the district court's application of local rules in disposing of motions, are reviewed under an abuse of discretion standard." *Valderas v. City of Lubbock*, 937 F.3d 384, 389 (5th Cir. 2019). Finally, the court reviews rulings

---

[3] The district court had previously granted summary judgment for KISD as to Jane's Title IX claim premised on Edwards's conduct, concluding that there was no genuine dispute of material fact as to KISD's lack of actual notice of Edwards's abusive behavior during the relevant period. Jane has not appealed the district court's dismissal of that claim.

on motions for judgment as a matter of law *de novo*. *Broussard v. State Farm Fire & Cas. Co.*, 523 F.3d 618, 624 (5th Cir. 2008).

## III.

Jane first raises a due process challenge to the district court's procedural rulings preceding the court's grant of JMOL. "Due process is implicated only for rulings of such a magnitude or so egregious that they render the trial fundamentally unfair." *Gonzales v. Thaler*, 643 F.3d 425, 430 (5th Cir. 2011) (internal quotation marks and footnotes omitted). Jane asserts that the district court imposed unfair limitations during the hearing on KISD's JMOL motion, affording her counsel inadequate time to respond effectively. Jane points to two specific rulings: (1) the court's denial of her counsel's request to read KISD's 29-page JMOL motion before KISD's counsel began argument and (2) its allowing only fifteen minutes for Jane's counsel to review the motion and prepare her response once KISD finished its opening argument.

It is true that the district court did not allow Jane's counsel time to review KISD's motion before KISD began its argument. Jane's counsel had asked for "at least two minutes" to read the motion, but the district court refused: "That's why you need to hear from her and hear her arguments. And then if you need to respond I'm going to give you a break afterwards, but you need to hear what she has to say."

After KISD's argument, the district court took a recess but allowed a break of only fifteen minutes for counsel to review the motion and prepare for responsive argument. Jane's counsel asked for "35 minutes or so just to organize," but the district court refused, explaining that it had repeatedly "warned" counsel that Jane's "case was so weak" in establishing the elements of her claims.

The trial record does not support Jane's contention that her counsel lacked adequate preparation time to respond to KISD's JMOL motion. To the contrary, Jane was given several warnings about an impending JMOL. During a pre-trial hearing, the district court warned Jane's counsel that Jane's § 1983 claim was unlikely to survive a JMOL motion. On the first day of trial, the court again stated that Jane could lose her § 1983 claim mid-trial. The next day, the court admonished Jane's counsel that she was "not focusing on the elements necessary for a Title IX claim," such that the court "might have to cure all this by" granting a JMOL motion. The district court raised the specter of JMOL again on the third day of trial, telling Jane's counsel:

> You better be prepared [tomorrow] for the motion for [JMOL]. You need to be able to itemize what material fact issues exist that a reasonable jury should hear in this case on all aspects of your remaining causes of action. . . . I'm here to tell you, one, if not more than one, if not all your causes of action may fail. You need to marshal all your evidence that you think you have put on to survive.

Even as KISD's counsel was presenting the JMOL motion, the district court offered Jane's counsel the option of "hav[ing] [KISD's counsel] raise all their points and then . . . respond[ing]," or "tak[ing] these [points] one at a time." Jane's counsel responded that "it would be much easier . . . to hear everything [before] approach[ing] it all."

At bottom, the record reflects that Jane's counsel had adequate opportunity to anticipate and prepare for KISD's JMOL motion, even if counsel could not have known exactly what points KISD would raise. Jane bore the burden of proving her claims with sufficient evidence. And the district court repeatedly made clear its inclination to grant JMOL given the perceived weakness of Jane's unfolding case-in-chief. The court even

pointed Jane's counsel to what she needed to do to survive a JMOL motion. Therefore, Jane cannot show that the district court abused its discretion, much less violated her due process rights, by cabining counsel's preparation time related to the JMOL hearing. The record simply does not support that the district court's procedural rulings were "so egregious that they render[ed] the trial fundamentally unfair." *Gonzales*, 643 F.3d at 430 (internal quotation marks and footnotes omitted); *see Menzies v. Procunier*, 743 F.2d 281, 288 (5th Cir. 1984) ("An unfair trial has been characterized as one that has been 'largely robbed of dignity due a rational process.'" (quoting *Houston v. Estelle*, 569 F.2d 372, 383 (5th Cir. 1978))). Jane's objections to the district court's procedural rulings thus lack merit.

## IV.

The district court granted KISD's JMOL motion and dismissed Jane's Title IX and § 1983 claims. Rule 50(a) allows a district court to grant a motion for JMOL before a case is submitted to the jury if

> a party has been fully heard on an issue during [the] trial; the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue; and under the controlling law, [the claim or defense] can be maintained or defeated only with a favorable finding on that issue.

*MultiPlan, Inc. v. Holland*, 937 F.3d 487, 494 (5th Cir. 2019) (internal quotation marks omitted) (quoting Fed. R. Civ. P. 50(a)). We consider each of Jane's underlying claims through the lens of Rule 50(a).

## A.

Under Title IX, "[r]ecovery of damages from a school district for a teacher's sexual harassment of a student requires proof that (1) a school district employee with supervisory power over the offending teacher (2) had actual notice of the harassment and (3) responded with deliberate

indifference." *King v. Conroe Indep. Sch. Dist.*, 289 F. App'x 1, 3 n.3 (5th Cir. 2007) (per curiam) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)).

The district court focused on the third element, determining that Jane failed to show that KISD had acted with deliberate indifference, which is a higher bar than negligence and requires KISD's response to have been "clearly unreasonable in light of the known circumstances." *Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4th 334, 341 (5th Cir. 2022) (quoting *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 167 (5th Cir. 2011)). Jane counters that KISD had actual knowledge of the harassment but actively hid Chatagnier's dangerous behavior from her parents.

We agree with the district court that Jane has not presented legally sufficient evidence of "deliberate indifference" by KISD. In hindsight, there is perhaps more that school officials could have done to try to prevent what happened. However, "[o]fficials may avoid liability under a deliberate indifference standard by responding reasonably to a risk of harm, 'even if the harm ultimately was not averted.'" *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 220 F.3d 380, 384 (5th Cir. 2000) (quoting *Farmer v. Brennan*, 511 U.S. 825, 844 (1994)). Here, the record shows that KISD school administrators took escalating steps to prevent an improper relationship from developing between Jane and Chatagnier: They followed up on reports of unseemliness; met with Chatagnier repeatedly to address professional boundaries; likewise repeatedly talked with Jane's parents about the inappropriate relationship developing between Jane and Chatagnier; forbade Chatagnier from tutoring Jane at school; and issued a written directive barring Chatagnier from having students in his classroom outside of scheduled times. From the evidence at trial, KISD's response to the risk of sexual abuse was not deliberately

indifferent or "clearly unreasonable in light of the known circumstances." *Roe*, 53 F.4th at 341.

Moreover, when school staff contacted Jane's parents to address suspicions surrounding Jane and Chatagnier's relationship, Jane's mother angrily complained about teachers "checking up on" Jane and assured the school that Chatagnier was a family friend who was "vital" to Jane's recovery. Jane's parents facilitated off-campus tutoring after school staff told them that the school would no longer allow Chatagnier to tutor Jane at school. And not only did they allow Jane to go unescorted with Chatagnier to an out-of-town weekend car show, when Balser inquired about the trip, Jane's parents lied about her father's accompanying them and brushed aside Jane's comment that she and Chatagnier had "hooked up" that weekend. By rationalizing Jane and Chatagnier's relationship and faulting school staff rather than cooperating with them, even after Chatagnier resigned, Jane's parents themselves frustrated a firmer response by KISD.

Because Jane failed to substantiate her Title IX claim with legally sufficient evidence, and if anything, the record substantiates that KISD "respond[ed] reasonably to a risk of harm," *Doe*, 220 F.3d at 384, the district court properly entered JMOL on this claim.

## B.

We next consider Jane's § 1983 failure-to-supervise claim for the violation of Jane's "right to bodily integrity" under the Fourteenth Amendment. She specifically asserts that KISD's deficient supervision policy led to a violation of her rights. "Under § 1983, a municipality or local governmental entity such as an independent school district may be held liable only for acts for which it is actually responsible." *Doe ex rel. Doe v. Dall. Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998). KISD therefore "cannot

be held liable under § 1983 on a *respondeat superior* theory." *Id.* (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).

Instead, "[t]o establish municipal liability under § 1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009). Official policy can "exist[] in the form of written policy statements, ordinances, or regulations, but it may also arise in the form of a widespread practice that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *Id.* (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)). "[U]nder Texas law, policymaking authority in an independent school district rests with the board of trustees." *Dall. Indep. Sch. Dist.*, 153 F.3d at 215; *see* Tex. Educ. Code § 11.051.

"A school district's failure to adopt an official policy on a given subject may serve as the basis for § 1983 liability only when the omission 'amount[s] to an intentional choice, not merely an unintentionally negligent oversight' . . . ." *Dall. Indep. Sch. Dist.*, 153 F.3d at 217 (quoting *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992)). An omission can be considered "an intentional choice only where the entity has acted with deliberate indifference." *Id.* Applied here, for KISD to be liable for failing to adopt a policy, the resulting harm must have been "the highly predictable consequence" of its board's failure to supervise KISD employees. *Peterson*, 588 F.3d at 850.

Jane argues that KISD's board did not have an official policy for the "supervision of educator sexual misconduct prevention." However, though there is no official "supervision" policy in the record, KISD's existing policies contain specific prohibitions on romantic or other inappropriate

social relationships with students. And KISD requires that "[a]ny District employee who suspects . . . that a student . . . has or may have experienced prohibited conduct shall immediately notify the appropriate District official." Further, upon receiving a report, the KISD official is required to investigate the allegations. Contrary to Jane's assertion, then, KISD had policies in place to address teacher-student sexual abuse. Foust, KISD's Superintendent, also testified at trial that KISD took additional steps to re-train their employees on sexual misconduct after Edwards resigned.

In any event, Jane cannot show that KISD's policy (or lack thereof) was "the moving force behind the violation of a constitutional right." *Id.* at 847. As discussed *supra*, school administrators actively supervised Chatagnier, investigated reports of impropriety, and attempted to set boundaries between Jane and Chatagnier, especially in the wake of Edwards's resignation. The relationship between Chatagnier and Jane's family also may unfortunately have somewhat impeded KISD's response. Regardless, the "moving force" behind the events that unfolded was not the omission of a formal or more robust policy, or deliberate indifference on the part of KISD.

As with her Title IX claim, Jane has failed to substantiate her § 1983 claim with legally sufficient evidence.

\* \* \*

The district court's judgment is

AFFIRMED.

13